**In The Matter of Frank KITCHEN, A Witness Subpoenaed Before the Grand Jury.**

**No. 1308, Docket 83–6083.**

United States Court of Appeals, Second Circuit.

Argued April 14, 1983.

Decided April 27, 1983.

Lumbard, Circuit Judge, filed opinion concurring in part and dissenting in part.

**1268**

Robert G. Morvillo, New York City (Obermaier, Morvillo & Abramowitz, P.C., Michael E. Quiat, New York City, of counsel), for appellant, Frank Kitchen.

James D. Harmon, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., L. Kevin Sheridan, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee, U.S.

Before FEINBERG, Chief Judge, and LUMBARD and MESKILL, Circuit Judges.

FEINBERG, Chief Judge:

In a little over four months this court has been presented with three different appeals from judgments of the United States District Court for the Eastern District of New York holding in civil contempt under 28 U.S.C. § 1826(a) (1976) witnesses who claimed not to remember the information sought by a grand jury. In this most recent appeal, as in *In re Bongiorno,* 694 F.2d 917 (2d Cir.1982) and *In re Weiss,* 703 F.2d 653 (2d Cir.1983), the witness contends that the government failed to prove by clear and convincing evidence that his testimony was false and evasive. Appellant also raises serious challenges to the procedures below, contending that they violated his due process rights. For the reasons stated below, we reverse the judgment of the district court.

## I. FACTS

### A. Background

This case arises out of a grand jury investigation of whether officials of a corporation ("the Corporation") paid a "politically active lawyer," see *In re John Doe Corp.,* 675 F.2d 482, 484 (2d Cir.1982), the sum of $96,500 as part of a conspiracy to bribe a state official to resolve a dispute over a tax liability in the Corporation's favor.[1] Appel-

---

1. The opinion in the prior case used pseudonyms for the corporation and individuals involved to preserve the secrecy of the grand jury proceedings. Kitchen was referred to as Employee B. The parties appear to be somewhat less concerned about secrecy in this case, since the appeal was filed under Kitchen's real name. Nevertheless, because the panel that granted a stay pending appeal and expedited the appeal also ordered that all papers in this appeal be

lant Kitchen is and was at all relevant times manager of one of the Corporation's regions. The government believes that the bribe was discussed at a meeting in February 1977 ("the February meeting"), attended by the chairman of the Corporation ("the Chairman"), Kitchen's superior ("A"), Kitchen's subordinate ("B") and Kitchen himself. In the spring of 1977, the Corporation began an internal investigation of questionable practices called the Business Ethics Review. As part of this investigation, many employees, including Kitchen, filled out questionnaires. On his questionnaire, dated September 1, 1977, Kitchen originally checked off "no" in response to the question whether he had any knowledge of any payoffs or bribes "to settle any dispute with any government (such as tax disputes ...)". But after an interview with a corporation attorney ("C") on October 18, 1977, Kitchen changed his answer to "yes" and attached the following explanation:

> On about May 26, 1977, I attended [the February meeting] with [the Chairman, A and B]. During the course of the meeting, I surmized that a payment was going to be made to a state official for favorable treatment in a ... tax liability case....

C has testified before the grand jury, with the aid of notes he made during the interview, that Kitchen told him that he based this surmise on the fact that at the meeting there was discussion of hiring an expensive New York lawyer with an Italian name, and that entertainment was involved. C also testified that Kitchen told him that he had discussed the bribe separately with both B and A after the February meeting, and that A had told him not to worry about it.

The Chairman, A and B are all targets of the grand jury investigation and have refused to testify. Kitchen, on the other hand, has been granted use immunity pursuant to 18 U.S.C. § 6003. The government wants him to give testimony that will implicate his superiors in the bribe conspiracy, but he has not done so. However, this is not the first snag in the grand jury's investigation. The Corporation originally refused to turn over to the grand jury documents produced during the Business Ethics Review, and directed its employees, including C and Kitchen, not to testify about the Review, on the ground that this evidence was protected by the attorney-client privilege and work-product immunity. Judge Sifton entered judgments of contempt against the Corporation in January 1982 and against Kitchen in February 1982. The judgment against the Corporation was affirmed in March 1982, *In re John Doe Corp.,* supra, whereupon the Corporation produced the documents and C and Kitchen ceased to assert any privilege. At this point, by testifying as outlined above, C apparently so far redeemed himself as to become the prosecutor's witness against Kitchen. Kitchen's testimony, on the other hand, failed to satisfy the prosecutor, who contends that Kitchen's answers to questions about the February meeting, the supposed subsequent conversation with A and the interview with C are false and evasive and therefore contemptuous.

### B. Kitchen's Testimony

Kitchen has maintained from the time of his first testimony before the grand jury on the subject, in January 1982, until his final appearance on March 22, 1983, that he remembers very few details of the meeting in February 1977. He has testified repeatedly and unequivocally, however, that although the "tax situation" was discussed, no bribe or payoff was mentioned. He testified that he first learned that a bribe might be paid from a subsequent discussion with his subordinate, B, who informed him that B had received authorization to pay a bribe at the February meeting. Kitchen stated that he was shocked by this information, and that he "wanted to stay away from [the bribe]." Kitchen has also repeatedly testified that

sealed, we will again use pseudonyms to refer to the corporation and individuals under investigation. However, to the extent that portions of the record are used in the present opinion they are deemed unsealed.

he does not recall discussing the bribe with A. After being confronted with C's testimony and notes about the interview on October 18, 1977, he admitted that he was convinced that he must have talked to A, but continued to maintain that "I am telling the truth, I cannot recall whether I did or not."

Finally, Kitchen has testified that he does not remember any details of his interview with C, except that he "would have told him the truth" and that he was asked to amend his Business Ethics questionnaire. He explained that he originally did not mention the bribe on his questionnaire because he wanted to avoid involvement with the affair. When he did amend the questionnaire at C's prompting, the statement he gave was, he told the grand jury, inaccurate in two respects: first, in stating that the February meeting took place in May, a mistake he made in consulting his expense vouchers to fix the date; and second, in failing to explain that his surmise about what went on at the meeting was prompted by his discussion with B, in which B told him explicitly that a bribe was authorized at the meeting.

## C. The Contempt Proceedings

On March 22, 1983, the prosecutor, Kitchen and Kitchen's counsel appeared before Judge Henry Bramwell. The prosecutor requested that the judge direct Kitchen "not to give any false, evasive or equivocal answers during the course of his testimony this afternoon." In particular, the prosecutor wanted Kitchen to reconcile his inability to recall what happened at the February meeting and whether or not he talked to A about the bribe with the evidence of his interview with C. After denying Kitchen's attorney's requests that, among other things, the government be required to give him copies of the grand jury transcript and to specify the answers considered false or evasive, Judge Bramwell ordered Kitchen to "make a good faith effort to answer questions posed to you . . . [and to] give clear and positive answers before the Grand Jury," and not to "give false, evasive or equivocal answers." Kitchen then returned

to the grand jury and testified substantially as outlined above.

Thereafter, dissatisfied with this attempt by Kitchen to comply with the court order, the prosecutor moved by order to show cause for a judgment of civil contempt. On March 30, 1983, the matter was again heard by Judge Bramwell. The defense raised several procedural points. First, Kitchen's attorney again requested that the government set out the specific answers it considered contemptuous, and the government agreed to do so. Second, defense counsel requested that he be supplied with transcripts of C's grand jury testimony, since it appeared that the government would rely upon it to prove the falsity or evasiveness of Kitchen's testimony. The government agreed to supply Kitchen with the relevant portions of C's testimony, but successfully urged the court to consider all of it, including those portions not supplied to the defense, despite the defense's protestations that this infringed Kitchen's right to confrontation. Finally, Kitchen's attorney sought the right to call witnesses. The court stated that no witnesses would be required on April 1, when the hearing was scheduled to resume, but did not make any final ruling on the request.

At the April 1 hearing, the government called C as its only witness. C, relying on the notes he took during his interview with Kitchen, testified substantially as he had before the grand jury. At the close of direct examination, the court informed Kitchen's counsel that

[C] has been, as I see it, forthright and open, and I am not looking for you to test his credibility on this situation here, because . . . what he has given us is basically consistent with what the record seems to be. . . . It seems pretty credible to me.

When Kitchen's counsel protested and asked, "Is your Honor foreclosing me from questioning this witness with regard to his credibility?" the court responded, "You go right ahead and ask the questions." The court did permit a line of questions that revealed that C remembered nothing about

the interview or other events of the day except what was reflected in his notes. But the court did not permit C to answer other questions designed to show that C's interview with Kitchen was an important part of C's investigation and therefore more memorable to C than to Kitchen. Indeed, the court did not even permit Kitchen's counsel to explain why the questions were relevant, directing him simply to "proceed within the scope of what was brought out in [direct] examination...."

At the close of cross-examination, Kitchen's counsel raised two "open matters": first, he asked for a decision on his pending motion to dismiss the proceedings because the issue of Kitchen's purported contempt was not submitted to the grand jury before it was brought before the district court; and second, he asked whether "your Honor will permit me to call witnesses in defense of Mr. Kitchen." The court responded, "Not at this time." When Kitchen's counsel started to speak again, the court said:

> Your application is denied.

> It is my intention, after hearing [C], and after considering everything that has been before the Court concerning Frank Kitchen, that Mr. Kitchen has deliberately and willfully disobeyed an order of this Court.

■ The court then granted a stay until noon on April 4 to permit appeal, and the notice of appeal was filed on April 4. The stay was extended by agreement with the government until April 5, when a panel of this court granted a further stay pending oral argument of the appeal on an expedited basis. At oral argument on April 14, this panel again extended the stay until the appeal is decided, so that Kitchen is not now incarcerated.[2]

## II. DUE PROCESS CLAIMS

Kitchen argues that the procedure followed by the district court violated his right to due process in four respects: (1) he was not permitted to call witnesses on his own behalf; (2) the judge did not read papers submitted to him setting out Kitchen's defenses; (3) the judge curtailed cross-examination of C, the government's witness; and (4) the judge considered transcripts of all of C's testimony before the grand jury, portions of which were not made available to Kitchen's counsel. For the reasons stated below, we conclude that the proceedings were fatally defective and require reversal.

■ The statute in question grants the court the power "summarily" to order the confinement of a recalcitrant witness. But this authorization has never been taken literally. The enactment of § 1826 in 1970 has always been characterized as a codification of existing law, both procedural and substantive, on civil contempt. See *Weiss,* supra, at 665, and authorities cited therein; *United States v. Alter,* 482 F.2d 1016, 1022 (9th Cir.1973). In *Alter,* the Ninth Circuit concluded that

> section 1826(a) has no effect upon the procedural ground rules the [Supreme] Court had laid in cases anteceding ... the enactment of the statute—rules which expressly forbade summary proceedings for such contempts.

482 F.2d at 1022 (footnote omitted). This court has followed *Alter* in looking to Fed. R.Crim.P. 42(b) for guidance on the procedures to be followed before imprisoning a recalcitrant witness under § 1826(a).

■ A witness charged with civil contempt need not be afforded every right available to a defendant in a criminal contempt proceeding. Most notably, the government must prove criminal contempt beyond a reasonable doubt, and the defendant has the same right to a jury trial as in any other criminal prosecution, whereas the case against a witness charged with civil contempt need only be proven by clear and convincing evidence, and he has no right to trial by jury. *Weiss,* supra, at 661–662; *Alter,* supra, 482 F.2d at 1023. Nevertheless, we have recently identified a

---

**2.** Since Kitchen is not incarcerated, the requirement of 18 U.S.C. § 1826(b) that appeals from orders of confinement under § 1826(a) be disposed of within thirty days of the filing of the notice of appeal is not strictly applicable. *In re Weiss,* 703 F.2d 653 at 660 n. 6 (2d Cir.1983); *In re Rosahn,* 671 F.2d 690, 693–94 (2d Cir. 1982). We have complied with it nonetheless.

trend in this and other Circuits to afford the same or similar procedural safeguards to persons charged with civil contempt as to those charged with criminal contempt. *In re Rosahn,* 671 F.2d 690, 697 (2d Cir. 1982). This court has approved the general principles set out in *Alter,* which held that it was not enough that the judge considered the parties' affidavits, oral argument and offers for the record; the witness was entitled to an "uninhibited adversary hearing" at which "at the very least, . . . [he must] be allowed to probe all nonfrivolous defenses . . . ." 482 F.2d at 1024. See *In re Sadin,* 509 F.2d 1252, 1255 (2d Cir.1975). More specifically, we have held that before a witness is imprisoned under § 1826(a), he must receive notice of the charge against him and the facts upon which it is based, and time to prepare a defense. Id. He also has the right to counsel, *In re Di Bella,* 518 F.2d 955 (2d Cir.1975), and the right to a public hearing to the extent compatible with the secrecy of grand jury proceedings, *Rosahn,* supra. To be sure, these rights must be balanced against the need to avoid undue delay of ongoing trials and investigations by "minitrials" over recalcitrant witnesses. See *Matter of Fula,* 672 F.2d 279, 283–84 (2d Cir.1982). But we agree with the Ninth Circuit's observation that the urgency that is inherent in any grand jury investigation is not enough to justify eliminating a witness' basic right to a fair hearing before he is imprisoned, whether for civil or for criminal contempt. *Alter,* supra, 482 F.2d at 1023. Cf. *Rosahn,* supra, 671 F.2d at 697 (burden of imprisonment is the same for both types of contempt and requires similar procedural protections).

 Of course, these rules and general principles do not fully answer the specific questions raised by this appeal. The typical § 1826(a) case involves a witness who refuses to produce physical evidence, e.g., *Rosahn,* supra; *Fula,* supra, or unequivocally refuses to answer questions, e.g., *Di Bella,* supra; *Sadin,* supra, sometimes claiming "just cause," such as a constitutional privilege, e.g., *Alter,* supra (privileges against self-incrimination and electronic surveillance). But for the third time in a little

more than four months, we are confronted with a case presenting a heretofore unusual fact pattern: A witness who claims not to remember the information sought by a grand jury is held in contempt under § 1826(a) because the district judge finds his claim of memory failure to be so incredible as to amount to an outright refusal to testify. See *Weiss,* supra; *In re Bongiorno,* supra. As discussed in section III, *Weiss* and *Bongiorno* establish that the application of § 1826(a) in this situation is a narrow exception to the general rule that a witness who lies is not held in civil contempt, but is subject to prosecution for a criminal offense, e.g., perjury.

We think that the need for procedural protection is heightened in a case such as this one, where the court must decide not whether there is a legal justification for a witness' clear disobedience of an order, but whether the witness has really refused to give unequivocal answers or is simply unable to do so. When a case is in the grey area between contempt and perjury—when the true issue before the court is whether the witness is lying when he says "I don't remember"—the court must be sure to give the witness a fair opportunity to show that he is telling the truth. Cf. *Rosahn,* supra, 671 F.2d at 695 (full adversary hearing not required where witness and counsel "affirmatively represented to the court that she would not comply with the order of the court and grand jury that she produce the items, which she was obligated by law to produce."). We hold that in the sort of case now before us a fair opportunity must at least include the right to present all nonfrivolous defenses, see *Alter,* supra, and the right to confront all of the government's evidence, both documentary and testimonial, unless particular and compelling reasons peculiar to the grand jury function require some curtailment of the latter right.

 In particular, the right to present defenses must always include the right of the witness to take the stand in his own behalf, for by definition the witness' credibility is the main issue in these cases, and

he should have the opportunity to convince the district judge by his demeanor that he is telling the truth. The witness should also have the right to call any other witnesses whose testimony might be relevant to his defense. Of course, the district judge may require that before a third party is permitted to take the stand, an offer of proof demonstrating the relevancy of the proposed testimony be made and, considering the exigencies of any grand jury proceeding, the district judge would have very broad discretion. In addition, counsel for the allegedly recalcitrant witness should have the opportunity to present the defense's view of the evidence and of any legal issues, either by oral argument or in memoranda. Again, it is within the discretion of the court to control the extent and form of these presentations. Full cross-examination of the government's witnesses is an essential element of both the right to present defenses and the right to confront the government's evidence. Finally, the right to confrontation ordinarily includes the right to examine all documents considered by the court in reaching a decision.

■ The district court should also bear in mind that the burden is on the government to prove that the witness' answers are false and deliberately evasive. In this regard, the procedures established by the Ninth Circuit in *Matter of Battaglia,* 653 F.2d 419 (9th Cir.1981) are helpful:

A civil contempt proceeding on a witness' asserted memory loss requires a three-step analysis that shifts the burden of production to the witness, but always leaves the burden of proof with the government. First, the government must make a prima facie showing of contempt; i.e., that it made an authorized request for information, that the information was relevant to the proceedings, that the information was not already in the possession of the government, and that the witness did not comply....

Second, once the government has presented its prima facie case, the witness must provide some explanation on the record for his failure to comply....

If the witness fails to meet this "burden of producing evidence," the government's prima facie case is sufficient to meet its burden of proof for a finding of contempt.... The witness may meet his burden, however, where, as here, he testifies that he does not remember the events in question.

Finally, if the witness meets his burden of production by claiming a loss of memory, the government must carry its burden of proof for a finding of contempt by demonstrating that the witness in fact did remember the events in question, thereby establishing a willful failure to comply.

653 F.2d at 422–23 (citations and footnote omitted). We stress that a simple claim of memory loss is sufficient to shift the burden of production back to the government. Contrary to the government's assertion in its brief in this case, *Battaglia* does not require the witness to produce credible evidence supporting this claim; it is for the government to produce evidence and to prove that the claim is not credible.

■ Turning, then, to the facts of this case, we hold that the district court erred in not providing Kitchen with the opportunity to testify in his own behalf and to call witnesses. The government claims that Kitchen waived any such right by failing to make an offer of proof during the proceedings below. But a careful examination of the record reveals that the defense was never permitted to make such an offer, despite attempts to do so. We do not suggest that all of the witnesses that Kitchen claims he would have called should have been permitted to testify. But the court was required at least to permit an offer of proof and to consider whether the testimony would have been relevant to the issues of whether human memory may be selective and unreliable after five or six years, and whether there was in fact anything for Kitchen to remember—i.e., whether the bribe was discussed at the February meeting or in a subsequent conversation between Kitchen and A. As for the court's refusal to read Kitchen's papers, this alone

would not merit reversal, since the court heard oral argument on the points covered in the memorandum. But coming on the heels of the court's refusal to allow witnesses for the defense, it did contribute to the curtailment of Kitchen's right to present all nonfrivolous defenses.

■ A fair reading of the cross-examination of C, the government's witness, reveals that Kitchen's counsel was able to extract an admission of the main point the defense was trying to make, that is, that "the reasons that [C recalled] the Kitchen conversations are because, one, it was very important to [him] in the context of a very important investigation and, two, because [he had] notes of the conversation." Nevertheless, the court's persistent attempts to preclude Kitchen's counsel from asking questions relevant to this point hampered the presentation of an important defense. Moreover, it was highly improper for the judge to announce at the conclusion of the direct examination that he had already decided that C was credible, and that counsel should not attack his credibility on cross-examination. C was the only witness against Kitchen in a case in which the only issue was whether Kitchen lied to the grand jury; C's credibility was therefore a critical element of the case against Kitchen. The defense was entitled to a full opportunity to demonstrate through cross-examination that C's evidence was not clear and convincing.

■ Finally, Kitchen and his counsel had the right to examine all of the documentary evidence considered by the district court. The record does not reveal whether or to what extent the judge actually relied on any part of the transcript of C's testimony before the grand jury. Although it does appear that the judge read all of that testimony, it seems unlikely that his decision was based on parts not supplied to the defense, since the government agreed to give Kitchen all relevant portions. In any event, we need not consider this issue further in view of our holding that the failure to allow Kitchen to testify and to offer other witnesses was reversible error.

We realize that our holding in this case will mean that a grand jury faced with a witness who claims, however implausibly, not to remember what the grand jury wants him to recall will be somewhat hindered in its investigation. It will take some time to ensure that the proper procedures are followed in determining whether that witness is lying in order to avoid answering questions. But we believe that due process requires this small sacrifice of time and effort. This conclusion is supported by the Supreme Court's decision in *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), in which a witness was summarily imprisoned for sixty days or until he answered the questions put to him by a state court judge acting as a one-man grand jury. Oliver did not refuse to answer—rather, like Kitchen, he gave testimony, including claims of memory loss, that the judge considered false, evasive, and deliberately contradictory. The Supreme Court reversed on procedural grounds, stating that

> due process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation.

333 U.S. at 275, 68 S.Ct. at 508. Oliver was, of course, not confined under § 1826(a), but his offense and the terms of his imprisonment were manifestly similar to Kitchen's, and we believe that the requirements of due process are the same.

## III. SUFFICIENCY OF THE EVIDENCE

■ Although we find it necessary to reverse the judgment of the district court because of the procedural deficiencies already described, we think it advisable to address Kitchen's remaining points on appeal since the government may again seek to hold him in contempt. As we pointed out in *Weiss,* supra, at 662–667, a witness who testifies falsely is ordinarily subject to

prosecution for a criminal offense, e.g., perjury, but not to sanctions for civil contempt. *In re Michael,* 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945); *Ex parte Hudgings,* 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919). But the courts have fashioned a narrow exception to avoid being "put off by transparent sham . . . ." *United States v. Appel,* 211 F. 495 (S.D.N.Y.1913). It is by now clearly established in this circuit that § 1826(a) can be used to impose civil contempt sanctions on witnesses who give "obviously false evasive and equivocal answers in an effort to avoid providing information." *Weiss,* supra, at 667. See also *Bongiorno,* supra. In other words, a claim of inability to remember will be treated as the equivalent of an outright refusal to testify if it is both obviously false and intentionally evasive and obstructive. *Weiss,* at 662. The government must prove these elements by clear and convincing evidence. *Weiss,* at 667. The evidence establishing the falsity of the claim of inability to remember may be extrinsic, as in *Bongiorno,* supra, where photographs of the witness with the target of the grand jury investigation "intensified the impression that his answers were intended to be evasive," 694 F.2d at 922. Such evidence may also be intrinsic: even in the absence of extrinsic proof, the court may determine from the pattern and substance of the testimony that it is inherently incredible. *Weiss,* supra, at 667; *Bongiorno,* 694 F.2d at 922.

Kitchen asserts that the government has proven neither the falsity nor the intentional evasiveness of his testimony by clear and convincing evidence. The government has presented extrinsic evidence consisting of C's testimony about his interview with Kitchen in October 1977, C's notes of the interview, and Kitchen's amended questionnaire. In addition, the government argues that Kitchen's claim of memory failure is inherently incredible because the mere passage of time would not eradicate memories of events he admits he found shocking, and because the pattern of the testimony shows that Kitchen "forgets" only information that would implicate his superiors and therefore jeopardize his position at the corporation.

■ In our view, this simply does not add up to clear and convincing evidence that Kitchen's testimony is a transparent sham. The government identifies three events about which it contends Kitchen has been false and evasive: the February meeting, the conversation with A and the interview with C. On the critical issue of whether a bribe was discussed at the meeting, Kitchen's answer has been an unequivocal "no." This is not contempt, although it may be perjury. See *Weiss,* at 665–666. Even if Kitchen's testimony on this issue can be regarded as evasive because he sometimes used the phrase "I don't recall," and because it seems to be contradicted by the amended questionnaire, it is not necessarily untrue. It is quite possible that a bribe was discussed at the meeting in cryptic terms so that Kitchen did not understand what was meant until B told him afterwards. Thus, Kitchen would be unable to remember any actual discussion of a bribe at the meeting. His amended questionnaire would be, as he testified, incomplete in not explaining that his interpretation of the discussion at the meeting was based on the information supplied by B after the fact. This theory is supported by the government's own extrinsic evidence, for C testified before the grand jury that Kitchen

> didn't hear specifically anything mentioned [at the meeting] that someone was going to be paid off because I tried to get that information from him.

■ As to the other details of the February meeting, as well as the conversations with A and C, the extrinsic evidence proves nothing about the truth or falsity of Kitchen's testimony. Kitchen does not deny that these events took place or that C's version of what occurred is accurate. He simply says that he cannot now remember any of the details, even when prompted by the evidence of what he told C in October 1977. It is not incredible that Kitchen might not remember now or in early 1982, five years after the events in question, what he did

remember in October 1977, only nine months thereafter. We note that even by the time of the interview with C, Kitchen had forgotten the date of the February meeting. Even when the claimed loss of memory is compounded by an apparent pattern of selectivity and a motive to lie, the government's case on this record amounts only to a plausible theory that Kitchen might be refusing to supply information that he actually remembers. But on this record, which includes five appearances by appellant before the grand jury and nine informal discussions with the government in some 15 months, it is not inherently incredible that appellant is cooperating and simply does not remember.

This case is precisely the opposite of *Weiss* in this regard. Weiss' memory loss was inherently incredible if, in fact, there was anything for her to remember.[3] The government failed to prove the latter part of the proposition—the premise that Weiss had actually worked at the job the details of which she claimed to have forgotten. Kitchen, on the other hand, does not dispute that the three discrete events about which he is being questioned actually occurred, but claims that he does not remember the details of what happened on these three occasions. This claim may well expose him to a criminal prosecution, e.g., for perjury, but it is not so inherently incredible as to fall within the narrow exception justifying use of the awesome civil contempt power.

In sum, on this record, the government has not proven by clear and convincing evidence that Kitchen's testimony before the grand jury is false and evasive. Thus, the judgment of contempt cannot stand.[4]

## IV. CONCLUSION

Because the procedures followed in the district court deprived appellant of due process, and because the government failed to carry its burden of proof, the judgment of contempt is reversed. The mandate shall issue forthwith.

LUMBARD, Circuit Judge, concurring and dissenting:

I concur in all but parts III and IV of Chief Judge Feinberg's opinion. I agree with my colleagues that however clear and convincing the evidence of a refusal to testify may be, the district court was required to hear the defendant, upon his request to be heard, before adjudging him in contempt. I also agree that the court should have permitted the defendant to make an offer of proof and should have accepted any relevant evidence the defendant proffered. For these reasons, I concur in reversing the judgment.

However, because the proceedings before the district court were fatally incomplete, I do not believe it worthwhile to decide whether there is sufficient evidence in the record currently before us to justify a finding of civil contempt. I cannot say that, were the district court to follow proper procedures and accept Kitchen's testimony, the record would not establish by clear and convincing evidence that Kitchen had given "obviously false evasive and equivocal answers in an effort to avoid providing information." *In Re Chanie Weiss,* 703 F.2d 653 at 667 (2d Cir.1983).

The majority seems to explain that it cannot reject Kitchen's alleged failure to recall any of the details of the February meeting, because "[i]t is quite possible that a bribe was discussed at the meeting in cryptic terms so that Kitchen did not understand what was meant until B told him afterwards." Although this story might

---

**3.** We are inclined to agree ... that it is inherently incredible that a 34-year-old person, with no traumatic or medicinal reason for a memory loss, who worked for one-and-a-half years at a job that ended less than five years earlier would retain virtually no memory of any detail as to her salary, her hours, her coworkers, people she counseled, where she worked, where she lived at the time, or the nature of what she did.
*Weiss,* supra, at 668.

**4.** Appellant also argues that the contempt proceeding was premature because the grand jury had not indicated by a vote that appellant's testimony was evasive. We find this argument has no merit.

explain why Kitchen claims that no one expressly discussed a bribe at the meeting, it fails to explain why he cannot remember any of the "cryptic comments" or unusual circumstances of the meeting, the significance of which, by Kitchen's own testimony, should have become clear to him when B told him the "shocking" truth about what had gone on. Certainly there is clear evidence that Kitchen remembered these details at one point. He signed a statement to the effect that "during the course of the meeting" he surmised that a bribe was to be paid. He apparently described the suspicious circumstances of this meeting to C. It seems incredible to me that a witness of Kitchen's intelligence and position of responsibility can now remember nothing of the meeting except the discussion of a tax liability. I do not believe that we can now foreclose the possibility that, after listening to any testimony Kitchen might choose to give as well as any additional evidence the government might offer, the district court could find evasive and unworthy of belief Kitchen's habit of forgetting anything that might implicate his superiors. Such a pattern of incredible statements would provide adequate grounds for a finding of contempt when supported by the government's clear and convincing extrinsic evidence that at one time Kitchen had recalled the meeting with considerably greater clarity. We should not forget that the grand jury's investigation of the alleged bribe has been resisted and delayed in every possible way by the company's officers, including Kitchen.