**In the Matter of George SINADINOS, a witness before the Special March 1983 Grand Jury.**

No. 85–1430.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1985.

Decided April 12, 1985.

Opinion Issued April 24, 1985.

George B. Collins, Collins & Uscian, Chicago, Ill., for plaintiff.

Judith F. Dobkin, U.S. Dept. of Justice, Chicago, Ill., for defendant.

Before BAUER, ESCHBACH, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

George Sinadinos was haled before a grand jury under a grant of use immunity. The prosecutor asked him a series of questions about a betting operation in which the prosecutor thought Sinadinos involved. Despite the grant of immunity, Sinadinos refused to testify, stating in response to each question: "I respectfully decline to be a witness against myself. I do not know what other persons have said to you, and if I innocently speak differently from even one other witness, I can be charged with false swearing, and there may be electronic surveillance. I base this on the Fifth Amendment."

The prosecutor moved to hold Sinadinos in contempt under 28 U.S.C. § 1826(a). A hearing on February 14, 1985, dispelled any arguments about surveillance, but Sinadinos asserted that he had a poor memory. A hearing on March 14, 1985, was devoted to this issue. A psychiatrist testified on Sinadinos's behalf that in earlier years Sinadinos had taken Placidyl in conjunction with alcohol, a combination that might have impaired his ability to recall. The psychiatrist concluded that Sinadinos "is going to remember [some] things with accuracy and there is [sic] going to be other things that he is not going to remember. This is going to be inconsistent and without pattern." The district judge concluded that Sinadinos had not demonstrated an inability to answer questions as a general matter. The judge stated that the psychiatrist offered "no support for the proposition that [Sinadinos] would ... misremember, and is [sic] remember things that did not occur or state things that did not happen ... I do not find

evidence ... for the contention that he will say things before the Grand Jury that are false and do so innocently because of whatever limited mental impairment or memory impairment that he might have." The judge remarked that if Sinadinos "doesn't remember he is expected to say so".

Before the grand jury later that day, Sinadinos answered many questions. He admitted taking bets and answered other questions about his own life. But Sinadinos rebuffed most efforts to obtain information about his dealings with others in any gambling operation. In response to more than 60 questions about his professional affiliations, Sinadinos repeated the words: "I've been advised by my psychiatrist that my memory is exceedingly poor due to many years of medication. For that reason I must respectfully decline to answer that question because I don't feel confident that I can recall enough to speak the truth." Though Sinadinos answered "I do not remember" to questions such as "What is your social security number" and "What is the approximate number of wagers you have taken during the past month," he used the formulaic answer for most questions about the betting activity of his acquaintences. He simply declined to venture such memory as he possessed. Perhaps he feared that the answer "I do not remember"—as applied to the identity of the person to whom Sinadinos had given the bets he admitted taking the day before—would not have been very persuasive.[1]

Back before the district judge, Sinadinos's counsel invoked *In re Battaglia*, 653 F.2d 419, 422 (9th Cir.1981), for the proposition that no one may be committed for refusing to supply information to a grand jury unless the prosecutor first establishes "that the information was not already in the possession of the government". Here, counsel maintained, the government had

---

1. One illustrative exchange:

 Q—Who do you work with in taking bets?
 A—I take bets myself. I take bets.
 Q—Do you work with anyone else in taking bets?

A—I've been advised by my psychiatrist that my memory is exceedingly poor due to years of medication. For that reason I must respectfully decline to answer that question because I don't feel confident that I can recall enough to speak the truth.

established only that the information sought was pertinent to a legitimate inquiry of the grand jury; the government had not shown that it lacked the information it sought from Sinadinos. The district judge responded: "I do not agree that the Government must demonstrate that the information was not already in their possession when they ask the witness concerning it. If that is stated in that case, I disagree with it and disregard that as a precedent." The judge then concluded that Sinadinos's formulaic claim of anxiety about the state of his memory was a wilful failure to testify. He held Sinadinos in contempt. We decided the appeal on April 12, 1985, in order to comply with 28 U.S.C. § 1826(b), and we noted that this opinion would follow.

### I

There is a longstanding debate about what sort of showing the government must make to overcome a good faith claim of privilege before the grand jury. One court has required the government to file an affidavit showing that the information sought is relevant to the grand jury's inquiry, that the grand jury has jurisdiction, and that the grand jury has a special need and does not seek the information primarily for a purpose unrelated to the investigation. *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (3d Cir.1973). This court has rejected such a requirement, and so have many other courts. E.g., *In re Walsh*, 623 F.2d 489 (7th Cir.1980); *In re Grand Jury Proceedings (Doe)*, 754 F.2d 154 (6th Cir.1985). We concluded that even in the face of a colorable claim of privilege, "there can be no privilege to refuse to appear before the grand jury until the government demonstrates some compelling need" for the testimony. *Walsh, supra,* 623 F.2d at 493.

This case does not involve a claim of privilege, and Sinadinos apparently would be happy with a lower standard: "need" rather than "strong need" or "compelling need" for the information. Sinadinos tells us that the contempt statute is designed to produce information. When the grand jury does not "need" the information, the questioning does not meet the standard for compelling replies. So, Sinadinos concludes, the prosecutor must show by clear and convincing evidence that the grand jury lacks the information in question and thus still needs it from him.

In an extreme case there might be a need for proof of need to dispell a witness's showing of harassment. Suppose the grand jury had wrapped up its investigation. The prosecutor—perhaps frustrated by inability to get solid evidence against one suspect yet confident that the suspect will never talk—calls the suspect as a witness for the sole purpose of inducing him to balk, which leads to some punishment for contempt in lieu of punishment for the (unprovable) substantive crime. We have said that the civil contempt process may not be used merely to punish (as opposed to gathering information). *In re Credidio,* 759 F.2d 589 (7th Cir.1985). The situation here, though, is leagues from harassment amounting to abuse of process. Sinadinos does not tell us that the grand jury has all the information it seeks; Sinadinos does not so much as hint that the prosecutor called him as part of a ploy to administer punishment rather than obtain evidence.[2] He says only that no one may be compelled to testify unless the government proves that the grand jury lacks the evidence around which the questions revolve. Put in this unembroidered form, the argument fails.

 The grand jury is an investigative body. It is entitled to ask questions to

2. Sinadinos's counsel maintained at oral argument that the prosecutor's statement at the contempt hearing—that the grand jury was investigating a "horse book" at four named addresses and that "over twenty people ... have been identified as bookmakers, runners, tabulators or bettors"—shows that the grand jury has what it

needs. We do not so interpret the statement. The prosecutor did not say whether the belief was based on evidence, as opposed to rumor or suspicion. As we spell out below, the quality and quantity of evidence may be more important than the mere existence of some evidence.

develop the full picture of a potentially criminal enterprise. It carries on its work expeditiously and in secret. *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). Courts should permit it to proceed substantially unhindered. *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). Legitimate claims of privilege or statutory right must be honored, *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), but the rest of the time the grand jury and the prosecutor, rather than the court and the witness, have the right to select the direction and depth of investigation. The grand jury and the prosecutor best know the status of the investigation, the value of pursuing additional leads or shedding new light on traveled paths, or curtailing the investigation.

We could accept Sinadinos's position only at substantial cost to the traditional role of the grand jury and the rules surrounding it. In order to establish that the grand jury did not have the information it seeks from the witness, the grand jury would have to disclose a great deal of information about the state of the investigation. What facts does the grand jury have, who did it hear, what did they say, where is it going, and what does it still need? To say that disclosing these things would create tension with the traditional rule of secrecy would be to understate greatly. The investigation is ongoing, the time when secrecy is most important. And the person seeking the disclosure here—and, we suppose, in similar cases—may be deeply involved in the criminal enterprise. We could not preserve secrecy while accommodating Sinadinos's request.

Even if the district court could preserve much of the secrecy of the investigation, perhaps by holding any hearing in camera, it could not do this without interrupting the progress of the investigation. The interruption would be the occasion of a trial on a small scale, inquiring into the current state of the investigation and how much information it "really" needs. *Calandra* held that expedition is so highly valued that

a court should not stop to investigate claims that the prosecutor is using illegally seized information. 414 U.S. at 349–52, 94 S.Ct. at 620–22. The claim for a mid-investigation investigation *of* the grand jury is much weaker here. The usual rule—that a witness has no legal right even to be told the nature of the inquiry and whether he is a "target" of the investigation—responds to these concerns about secrecy and expedition. See *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 8.8 (1985).

However that may be, we doubt that an investigation into the nature of the evidence would be worth the candle. What does it mean to say that information is "not already in the possession of the grand jury?" Is a hint or clue in the grand jury's hands about Sinadinos's confederates enough? How about the testimony of one witness that he saw Sinadinos hand betting materials to another identified person? Two other people? The grand jury does not deal with the most reliable of witnesses, and it may want confirmation of what the first one says. The second witness may corroborate, elaborate, or qualify what the first said; the second may also deny it. There is no formula by which a court can determine how much evidence is enough. That depends on the reliability of witnesses, on the chance that one more witness may add a valuable detail, on the difficulty of getting corroboration and contradiction by other means. "How much is enough" is a question without an answer. When a question has no right answer it is the wrong one to ask of a court. The prosecutor and the grand jurors must ask it of themselves, and their answers will be guided by their knowledge of the full investigation and the many other uses of their investigatorial time. The principal safeguard here lies in the regard the investigators have for doing good jobs, not in a model of supervision that asks of courts questions to which there are no useful answers.

This is the usual and proper response to a claim by a suspect or witness that the government has "enough" information and ought to stop investigating. When Jimmy

Hoffa maintained that the government should have arrested him, once it had probable cause, rather than continue the investigation by using spies that infiltrated his circle, the Supreme Court replied that "police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional obligation to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa v. United States*, 385 U.S. 293, 319, 87 S.Ct. 408, 422, 17 L.Ed.2d 374 (1966). We held in *United States v. Zarattini*, 552 F.2d 753, 756–57 (7th Cir.1977), that a grand jury may continue an investigation of some crimes even after returning indictments on related ones, though this produces more information about the crimes subject to the outstanding indictments. Claims of constitutional right and statutory command to one side, how far the inquisitorial arms of the government pursue leads concededly relevant to a criminal investigation is a matter for their judgment alone.

Sinadinos tells us, though, that both the Second and Ninth Circuits require the prosecutor to establish, as part of the prima facie case of contumacious refusal to testify, that "the information was not already in the possession of the government". *In re Kitchen*, 706 F.2d 1266, 1273 (2d Cir.1983), quoting *In re Battaglia, supra*, 653 F.2d at 422. The quotation in context reads:

> A civil contempt proceeding on a witness' asserted memory loss requires a three-step analysis that shifts the burden of production to the witness, but always leaves the burden of proof with the government. First, the government must make a prima facie case; i.e., that it made an authorized request for information, that the information was relevant to the proceedings, that the information was not already in the possession

of the government, and that the witness did not comply. *See, e.g., United States v. Hankins*, 565 F.2d 1344, 1351 (5th Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979).

> Second, once the government has presented its prima facie case, the witness must provide some explanation on the record for his failure to comply..... The witness may meet his burden ... where, as here, he testifies that he does not remember the events in question.

> Finally, if the witness meets his burden of production by claiming a loss of memory, the government must carry its burden of proof for a finding of contempt by demonstrating that the witness in fact did remember the events in question, thereby establishing a willful failure to comply.....

Both the Second and Ninth Circuits reversed adjudications of contempt because, they believed, the district courts had not followed the third paragraph of this approach: they had not required the prosecutor to establish the witness's memory, and thus his ability to comply with the order to testify.

The statement in each opinion that the government need show that it does not possess the information was unelaborated and unnecessary. Because each case went off on the appropriate response to a claimed lack of memory, neither discussed with any care the elements of the government's initial showing.

The pedigree of the other courts' statements also is questionable. *Kitchen* cites only *Battaglia*, which cites only *Hankins*. *Hankins*, in turn, is a tax summons case. It asserted that the government carried its burden to obtain enforcement of a summons by showing that it was "administratively regular and that the information sought was relevant, material, and not in the hands of the Commissioner." For this it cited *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). *Powell* construed, among other tax laws, 26 U.S.C. § 7605(b), which says that "[n]o taxpayer shall be subjected to unnecessary examination or investigations ..." *Powell* stated that § 7605(b) "does appear to re-

quire [as a condition of enforcing a summons] that the information sought is not already within the Commissioner's possession" but continued: "we think its primary purpose was no more than to emphasize the responsibility of agents to exercise prudent judgment in wielding the extensive powers granted them by the Internal Revenue Code." 379 U.S. at 56, 85 S.Ct. at 254.

"Prudent judgment," even in tax cases, falls short of an absolute bar against getting better evidence just because the IRS has some. *United States v. Nelsen Steel & Wire Co.*, 485 F.Supp. 949, 954 (N.D.Ill. 1980). At all events, this case does not involve § 7605(b); neither did *Battaglia*, *Kitchen*, or *Hankins*. The special constraints § 7605(b) places on tax summonses do not apply to ordinary grand jury investigations. Quite the contrary, the legislative history of the Organized Crime Control Act of 1969, which included 28 U.S.C. § 1826, emphasized that the powers of the grand jury would be extensive. The Senate Report stated that the statute "is designed to codify present practice. See *Giancana v. United States*, 352 F.2d 921 (7th Cir.), *cert. denied*, 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed.2d 362 (1965)." S.Rep. 91–617, 91st Cong., 1st Sess. 148 (1969). Our opinion in *Giancana* had emphasized the great discretion a grand jury possesses to select its objectives and methods. We said that a grand jury "may adapt its form of approach to that most strategically suited to elicit the facts. Its form may be direct or indirect. If the latter, certain questions might be considered irrelevant if standing alone, when they are actually relevant as part of a plan to elicit material information ..." 352 F.2d at 924.

We decline to follow the dicta of *Kitchen* and *Battaglia*. So far as we are aware, no court has ever required a grand jury to show "that the information [is] not already in the possession of the government," as a condition of requiring a witness to testify, in the absence of a claim of privilege. We will not be the first.

II

The statute under which Sinadinos was committed, 28 U.S.C. § 1826(a), permits the incarceration of a witness who "refuses without just cause shown to comply with an order of the court to testify." Sinadinos maintains that the defects in his memory are "just cause shown." The argument fails for two reasons, each sufficient. First, it is based on a factual assertion that the district court found to be unsupported: that Placidyl and alcohol induce people to "remember" things that were not so. The psychiatrist testified, and the district court found, that Sinadinos's memory problems would be gaps in memory, not the spontaneous creation of unreliable memories. Sinadinos should have asserted any actual lack of memory, as the district judge instructed. (This is not to say that the court would have been required to accept such a claim. It might properly have thought the gaps in Sinadinos's memory all too convenient.) [3]

Second and more fundamentally, Sinadinos's argument is based on the legal assertion that a witness may decide for himself when the risk of giving false testimony is "too great to bear." Sinadinos purports to be worried that *if* he answers the questions, and *if* some answers turn out to be

---

3. The pattern of Sinadinos's invocation of anxiety about his memory casts doubt on the bona fides of the claim. He invoked the formula about the psychiatrist with suspicious selectivity when the questions led toward his associates. Here is one sequence:

Q. Have you seen the Dominick Mele that you worked with at the First Line Track Service since that time?
A. Yes.
Q. On what occasion?
A. He used to come frequently to my restaurant, the night club I had on Van Buren and Halstead. He was a customer of mine.
Q. What was the name of the night club?
A. The Hellas Cafe.
Q. Did you sell that night club?
A. Yes.
Q. When?
A. About four or five years ago, roughly.
Q. Since that time have you seen Dominick Mele?
A. Possibly. I really can't recall.
Q. Have you seen Dominick Mele within the last month?
A. No.

false because of the effects of the drug, and *if* he is prosecuted for perjury based on those answers, the criminal process will be unable properly to assess his position that the answers, though false, were not knowingly so. This sequence is implausible as a factual matter. In any future criminal prosecution for perjury the government would need to show beyond a reasonable doubt that Sinadinos knew that his answers were untrue. Sinadinos's fear about unwarranted convictions for perjury is more than just implausible, though; the chain of speculation is irrelevant. It starts with the unargued premise that the witness, rather than the court, may decide when the risk is too great. That premise is not true. A witness may not refuse to testify just because he has a low opinion of the accuracy of criminal trials—or because he has a substantial aversion to the risk of being accused. Then any hypersensitive witness, or one poorly informed about the prosecution's burden in a trial for perjury, could excuse himself from testifying.

■ The decision about when the risks of error become too great—if they ever do—is for the judge rather than the witness. For example, if a witness fears that testimony will incriminate him, and the judge finds that possibility to be remote, then the witness must testify despite his subjective fears. The judge, not the witness, has the final say about the level of risk that will excuse compliance. If a witness asserts illness, amnesia, or other testimonial incompetence, he must abide the decision of the court. If the court rules the witness competent, he must speak. The defects in the testimony go only to credibility. *United States v. Harris*, 542 F.2d 1283, 1303 (7th Cir.1976). So too with the

Q. Have you seen Dominick Mele within the past year?
A. Possibly, but I can't recall specifically. You could run into anyone on the street.
Q. Have you worked with Dominick Mele since you worked with him at First Line Track Service?
A. [Formula]
Q. What is Dominick Mele's business?
A. Do you mean does he have a business himself or what?
Q. Yes. What does he do?
A. [Formula]

sort of risk Sinadinos says he fears. He must offer the grand jury the best of his recollection. He may qualify his answers all he wants; he may say that he does not trust a particular recollection; but he may not refuse to testify because he does not think he will get a fair shake in a trial for perjury.

The district judge heard Sinadinos's claims and fears fully. He properly found that Sinadinos should be required to supply all of the details of his recollection, however hazy, and claim specifically when memory utterly failed. Sinadinos decided to follow a different path and to judge his own claims. The adjudication of contempt was proper.

AFFIRMED.

Q. Have you known Dominick Mele to use any other names?
A. No, not that I can remember.
Q. Do you know where he lives?
A. Possibly, but I can't recall specifically. He may have told me possibly, but I don't remember.
Q. Does Dominick Mele tabulate bets on horse races?
A. [Formula]

A court might conclude that this pattern speaks volumes about Sinadinos's memory.