810 F.2d 700
 55 USLW 2433, Fed. Sec. L. Rep. P 93,152,
RICO Bus.Disp.Guide 6520
 HARRIS TRUST AND SAVINGS BANK, as Executor of the Estate of
Mary Ellis, Plaintiff-Appellant-Cross-Appellee,
v.
James ELLIS, et al., Defendants-Appellees-Cross-Appellants.
 Nos. 85-2963, 85-3059.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 3, 1986.
Decided Jan. 27, 1987.
 
 Thomas A. Doyle, Baker & McKenzie, Chicago, Ill., for plaintiff-appellant-cross-appellee.
 Brian J. Redding, Chadwell & Kayser, Ltd., Michael L. Brody, Schiff, Hardin & Waite, Joseph E. Coughlin, Lord, Bissell & Brook, Chicago, Ill., for defendants-appellees-cross-appellants.
 Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 When Oscar Ellis died in 1968, his will apportioned his estate between a marital trust for the benefit of his wife Mary and a residuary trust for the benefit of Mary and his two children. The estate's principal assets were four farms and stock in three closely held corporations. Oscar had founded one of these, Moline Consumers Co., in 1917, and working control had passed to his son James by the time of Oscar's death. James was also a member of the board of First National Bank of Moline, which served as the executor of the will and trustee of both trusts. Oscar's will gave James, as "adviser" to the trustee, power to veto the trustee's sale of any stock and to vote the shares held by both trusts. It gave Mary the power to obtain from the trustee "such amounts from the principal of the trust as she from time to time may request in writing" and afforded her a power of appointment over the trust's assets on her death. Until then, however, the trustee had discretion (subject to James's veto and Mary's right to withdraw principal) to make all investment decisions.
 
 
 2
 A dispute with the Internal Revenue Service about the valuation of the closely held corporations was settled by valuing the stock of Moline Consumers at $325 per share. Nonetheless, in parceling the stock between the marital and the residuary trusts to achieve the appropriate funding of each, the executor valued the stock at $271 per share. The probate court in Illinois approved the apportionment and closed the estate in June 1981.
 
 
 3
 Shortly after the trusts had been funded, the trustee proposed to sell the marital trust's stock of Moline Consumers to that firm, for $271 cash per share. The total exceeded $880,000. The presence of James Ellis on the trustee's board created a conflict of interest, so the trustee filed a petition asking for a decree authorizing the sale. The petition also asked for the appointment of a guardian ad litem for Mary Ellis, then 85 years old and in a nursing home. The court appointed a guardian, who demanded "strict proof" of the trustee's contention that the sale would be advantageous to the trust.
 
 
 4
 The court later held an evidentiary hearing, in which the guardian participated. An officer of the trustee testified that the sale was advantageous because the estate should hold cash (to provide for Mary) rather than illiquid stock that paid low dividends (about 1% of the estimated value). The trustee's application to approve the sale was backed up by a report prepared by Duff & Phelps, Inc. Moline Consumers makes and sells ready mix concrete and other construction aggregates. The Duff & Phelps report compared Moline Consumers' income, profits, and assets with those of three publicly traded firms in the same line of business. Duff & Phelps concluded that the Moline Consumers stock, if traded, would sell for $417 per share--a multiple of 4.4 times its average yearly earnings for the last five years, and only 28% of the firm's "book value", which the report disclosed. Duff & Phelps then applied a discount of 35% to reach $271. The report stated that the discount reflected the illiquidity of the stock and the fact that the estate held a minority bloc. After listening to the evidence, the court entered an order finding, among other things, "that the sale of said stock to Moline Consumers Company is advantageous to the trust".
 
 
 5
 The bank, as executor, discovered in 1983 an error in the computations that had produced the division between the marital and residuary trusts. The marital trust had been underfunded by about $224,000. The executor proposed to move 423 shares of Moline Consumers stock from the residuary trust to the marital trust, again at a valuation of $271 per share, to satisfy $114,633 of the shortfall. (The lower the valuation, the more stock the marital trust would get, because the shortfall had been computed in dollars.) A new petition was filed in the estate case, and a new guardian ad litem was appointed. The court approved the transfer at $271 per share. The trustee proposed a new sale to Moline Consumers at $271. Before this could be approved Mary died, and Harris Trust & Savings Bank became the executor of her estate. Harris Trust opposed the sale at $271, claiming that the value of Moline Consumers was closer to $1,400 per share (book value) and that the apportionments and sales had been fraudulent. Despite these protests the court found that the second sale at $271 was appropriate, and it also found that there had been no fraud in any earlier proceeding. The Appellate Court of Illinois, in an unpublished opinion, affirmed the order approving the sale but vacated the findings concerning fraud, concluding that these were gratuitous. In re Estate of Mary Ellis, 133 Ill.App.3d 1159, 99 Ill.Dec. 674, 496 N.E.2d 20 (3d Dist.1985).
 
 
 6
 Meanwhile Harris Trust filed this suit under Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-68. James Ellis, Moline Consumers, Duff & Phelps, and the First National Bank of Moline are the defendants. Harris Trust maintained that James had used his position to acquire the stock in 1981 and 1984 at an insufficient price and that the disclosures made in connection with the judicial proceedings had been inadequate and fraudulent. Because some of the documents had been mailed, Harris Trust insisted, there must have been at least two instances of mail fraud, producing a "pattern" of racketeering under RICO and authorizing treble damages.
 
 
 7
 * The district court dismissed the securities claim for failure to allege fraud "in connection with" the purchase or sale of a security and the RICO claim largely because of failure to plead with particularity under Fed.R.Civ.P. 9(b). 609 F.Supp. 1118 (N.D.Ill.1985). The court relied on O'Brien v. Continental Illinois National Bank & Trust Co., 593 F.2d 54 (7th Cir.1979), and distinguished Norris v. Wirtz, 719 F.2d 256 (7th Cir.1983), cert. denied, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984). O'Brien, a suit by trustees against an investment adviser, held that an adviser's misdeeds in buying and selling stock on a national stock exchange (including poor investments and potential conflicts of interest) are not "in connection with the purchase or sale" of securities, when the adviser has absolute authority and the trustee's or trust beneficiary's only recourses are to dissolve the trust or sue under state law. Norris held, in contrast, that Sec. 10(b) supported an action against a trustee accused of nondisclosure and self-dealing in the sale of closely held stock from a trust to a family corporation (as the defendants stand accused), when the beneficiary of the trust had the right to approve each transaction. The right to approve, we concluded, meant that the beneficiary made a securities decision each time the trustee acted.
 
 
 8
 Each side in this case claims the benefit of one decision and tries to distinguish the other. Harris Trust says that the case is like Norris because Mary Ellis made an investment decision every day (in deciding not to withdraw the principal of the trust) and was consulted in the judicial proceedings about the sale of the stock. Defendants say the case is like O'Brien because Mary lacked veto power over any sale and could not necessarily withdraw the Moline Consumers stock (as opposed to principal of a fixed value). They maintain that the grievance concerns the price, which is not actionable under the securities laws, rather than the disclosure, which is. Harris Bank replies that only disclosure is at issue, that the defendants did not disclose that the marital trust's share, combined with shares in James Ellis's control, were a majority and should have been valued as a majority, and did not disclose that book value was the best method of valuation. We could resolve this dispute only by going back to first principles, as the panel in O'Brien did. But we need not resolve the dispute; the findings of the state court make it clear that the plaintiff could not establish damages, so the merits of the dispute become irrelevant. The effect of the state judgments was presented to the district court (which did not reach the matter) and to us by a cross-appeal. We affirm the district court's judgment on this basis.
 
 
 9
 The first question is whether the securities laws authorize us to disregard findings by state courts, to which the answer is no. We have been reminded, see Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), that 28 U.S.C. Sec. 1738 requires federal courts to give to state judgments the same preclusive effect they would have in state courts--even when the federal proceeding is one within the federal courts' exclusive jurisdiction. So we must determine what effect the approval of the sales at $271 would have in an Illinois court.
 
 
 10
 That some facts may have been withheld from the state court is not a federal reason to disregard the state's decision. We held in Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 833-34 (7th Cir.1985), that the securities laws do not govern the adequacy of disclosure during judicial proceedings. What happens in court is regulated by the rules of discovery and procedure in the jurisdiction. So a claim that the Duff & Phelps report was incomplete and misled the court, or that the trustee's lawyers should have been more forthcoming, coupled with an assertion that more information would have led the judge to a different conclusion, does not state a claim under Sec. 10(b). Otherwise the securities laws would govern all appraisal proceedings in state court. Many corporate transactions produce a right to dissent and obtain a valuation from a judge. These appraisal proceedings are contentious. The corporation will introduce a valuation study; the dissenting investors will produce another; the parties will wrangle about which is the best estimate; often it will be possible to argue for wildly different values. See Metlyn, 763 F.2d at 834-38; Beerly v. Department of the Treasury, 768 F.2d 942, 945-48 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986); Fischel, The Appraisal Remedy in Corporate Law, 1983 Am. Bar Found. Res.J. 875, 889-96. Cf. Berg v. First American Bankshares, Inc., 796 F.2d 489, 498-501 (D.C.Cir.1986). If the securities laws overrode state principles of finality, the losing side in the appraisal could walk into federal court and try again, with the refrain that the winner in state court had defrauded the judge by not being forthcoming about which was the better estimate of value. The securities laws do not allow such a displacement of state valuation proceedings into federal court. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 474-80, 97 S.Ct. 1292, 1301-04, 51 L.Ed.2d 480 (1977).
 
 
 11
 A number of courts, including ours, have indicated that the federal securities laws require disclosure of enough information to put an investor on notice that he ought to pursue state remedies. E.g., Wright v. Heizer Corp., 560 F.2d 236, 250 (7th Cir.1977), cert. denied, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); Goldberg v. Meridor, 567 F.2d 209, 219 (2d Cir.1977) (Friendly, J.), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). More recent cases, including O'Brien, 593 F.2d at 60-61, reflect dissatisfaction with these holdings, because they use the securities laws to redress substantive violations of state law. Forcing people to "disclose" the inadequacy of the price, for example, puts defendants between a rock and a whirlpool: they can disclose in securities filings and find the disclosures used to obtain injunctions in state court; or they can remain silent and find the substantive adequacy of the price litigated in federal court as a matter of "disclosure". That is the posture of this case. O'Brien concluded that such a requirement is inconsistent with Santa Fe. See also Congregation of the Passion v. Kidder Peabody & Co., 800 F.2d 177, 181-83 (7th Cir.1986) (the securities laws do not apply to malfeasance and nondisclosures by an agent with full authority over a trading account); In re Financial Corp. of America Shareholder Litigation, 796 F.2d 1126, 1130 (9th Cir.1986) ("but for" causation is insufficient to show fraud "in connection with" the value of a security). Cf. Rand v. Anaconda-Ericsson, 794 F.2d 843 (2d Cir.1986) (securities law protects only investment decisions, not all decisions that influence value); Ray v. Karris, 780 F.2d 636, 641-43 (7th Cir.1985) (securities laws do not guarantee sufficient information to make correct litigating choices); Madison Consultants v. FDIC, 710 F.2d 57 (2d Cir.1983) (a claim under Goldberg is tenable only if the investor could have won in state court); Panter v. Marshall Field & Co., 646 F.2d 271, 288 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (plaintiff may not bootstrap a fiduciary duty case into securities fraud by alleging failure to disclose the breach of duty); Comment, Causation in Rule 10b-5 Actions for Corporate Mismanagement, 48 U.Chi.L.Rev. 936 (1981). We need not decide whether O'Brien forecloses all inquiry, however, because no court has held or even hinted that if the disclosures--adequate or deficient--provoke an action in state court to appraise the corporate shares, the federal securities laws regulate the disclosure in and conduct of that litigation. We conclude that they do not. The amount of disclosure required, and the remedies for deficient disclosure, in actions to appraise the value of stock are questions of state law alone. See also Henry v. Farmer City State Bank, 808 F.2d 1228 (7th Cir.1986) (applying the same principle in a RICO action).
 
 II
 
 12
 There are two questions of state law. The first is whether the state court decided or otherwise foreclosed an issue that is essential to the federal securities action. The second is whether, if preclusion ordinarily would prevent Harris Trust from prevailing on its federal claims, the allegations of fraud in the conduct of the state litigation require a different result. Both of these questions are difficult. We take them up in order.
 
 
 13
 In September 1981, after hearing testimony and reviewing the Duff & Phelps report, a state court concluded that the sale at $271 per share was "advantageous" to the marital trust. This was a genuine evidentiary hearing, sparked by the guardian ad litem's demand for "strict proof".[1] The judge inquired of the trustee's officer what the Duff & Phelps report meant; the guardian ad litem had the opportunity to put in contrary evidence but chose not to. The parties had both opportunity and motive to contest the price. It may be that the state hearing was perfunctory, but the judge offered all concerned an opportunity to offer such evidence as they chose. The proceeding in September 1981 therefore met the standards of full and fair adjudication.[2] See Kunzelman v. Thompson, 799 F.2d 1172 (7th Cir.1986).
 
 
 14
 When one party introduces evidence on a dispositive issue of fact, and an adverse party with opportunity and motive to contest the presentation chooses not to, the ensuing finding is entitled to the same respect as one litigated to the hilt. See E.Z. Loader Boat Trailers, Inc. v. Cox Trailers, Inc., 746 F.2d 375 (7th Cir.1984). Were it otherwise, a party could force his adversary into a different forum (here, the federal court) by the expedient of refusing to litigate in the forum originally designated for the proceeding. Cf. Migra v. Warren City School District Board of Education, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984).
 
 
 15
 The finding that the $271 price was "advantageous" to the trust was an essential ingredient of an order approving the sale. In Illinois a finding essential to a judgment precludes further litigation on the same question of fact. Kemling v. County Mutual Ins. Co., 107 Ill.App.3d 516, 63 Ill.Dec. 331, 334-36, 437 N.E.2d 1253, 1256-58 (2d Dist.1982); see also Restatement (Second) of Judgments Sec. 27 (1980). More, a finding that a sale is "advantageous" to a trust--in the face of a conflict of interest revealed to the court--must mean that the sale is not only permissible but also favorable. Trustees usually cannot engage in self-dealing, and although James Ellis was not the trustee but just an officer of the trustee (and an adviser to the trust), the potential for conflict placed on the trustee a duty to produce an advantageous price for the trust, not simply a minimally sufficient one. Harris Trust & Savings Bank v. Wanner, 393 Ill. 598, 66 N.E.2d 867 (1946); Flynn v. LaSalle National Bank, 9 Ill.2d 129, 137 N.E.2d 71 (1956); Restatement (Second) of Trusts Sec. 205 comment d (1959). The disposition of the court means that the judge believed, rightly or wrongly, that the trust had obtained such a price. The perfunctory nature of the proceeding and the abbreviated nature of the judge's conclusion give us pause, but they are sufficient under state law to have binding effect in future controversies.
 
 
 16
 This brings us to the second issue, concerning the effect of the claim of fraud. Harris Trust tries to avoid the preclusive effect of the finding by arguing that the defendants committed fraud on the court. Fraud is a reason to set aside a judgment. The argument proceeds: fraud vitiates the judgment; the state court would set aside its own judgment if asked; therefore the judgment is not binding within the state system; therefore under Sec. 1738 a federal court owes no respect to the judgment. The problem with the argument is that under Illinois law only the rendering court may set aside a judgment based on fraud, at least so long as the fraud did not either vitiate the jurisdiction of the rendering court, e.g., Vulcan Materials Co. v. Bee Construction, 96 Ill.2d 159, 70 Ill.Dec. 465, 449 N.E.2d 812 (1983) (a tax case, but equally applicable to probate matters because tax and probate courts operate under similar jurisdictional exclusivity in Illinois); Johnson v. Hawkins, 4 Ill.App.3d 29, 31-32, 280 N.E.2d 291, 292-93 (4th Dist.1972) (personal injury suit), or deprive the complaining party of all opportunity to assert his right or defense, e.g., In re Estate of Stith, 105 Ill.App.2d 429, 244 N.E.2d 834 (3d Dist.1969). The federal rule is similar. The aggrieved party must return to the rendering court under Fed.R.Civ.P. 60(b)(3)--within one year, at that--and not simply crank up a new suit. Cf. Standard Oil Co. v. United States, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976); Metlyn Realty, supra. See also Harnett v. Billman, 800 F.2d 1308, 1313 (4th Cir.1986) (claim preclusion applies to securities case despite asserted lack of knowledge in first litigation).
 
 
 17
 A claim of inadequate disclosure does not authorize a collateral attack on the judgment. A federal court bound by Sec. 1738 must honor this rule, just as any court of Illinois will. If Harris Trust tried to litigate a question of fraud in any state court other than the rendering court, it would be turned aside on grounds of issue preclusion. It therefore meets the same fate here. So long as the judgment of September 1981 finding the price of $271 to be "advantageous" stands, it binds Harris Trust. Turner v. Alton Banking & Trust Co., 166 F.2d 305, 309-10 (8th Cir.1948); Loyd v. Loyd, 731 F.2d 393, 400-02 (7th Cir.1984).
 
 
 18
 Harris Trust relies heavily on Northern Trust Co. v. Essaness Theatres Corp., 103 F.Supp. 954 (N.D.Ill.1952), as authority that a state judgment does not have preclusive effect in a case of this character. While that case does support Harris Trust's position, an Illinois court has recently said that Northern Trust "is not Illinois law." Baird & Warner, Inc. v. Addison Industrial Park, Inc., 70 Ill.App.3d 59, 72, 26 Ill.Dec. 1, 13, 387 N.E.2d 831, 843 (1st Dist.1979). Since this court must apply current Illinois law to determine the preclusive effect of an Illinois judgment, see Migra, 465 U.S. at 81, 104 S.Ct. at 896, the approach of Northern Trust is not determinative.
 
 III
 
 19
 To say that the state court's judgment establishes that the $271 price is "advantageous" to the trust is not necessarily to say that there was no fraud. Just as, under Santa Fe, an unfair price does not violate the securities laws when there has been full disclosure, so perhaps a fair price does not cure a lack of full disclosure. Plaine v. McCabe, 797 F.2d 713, 721-22 (9th Cir.1986). "Fairness" is a range, not a point, and information is helpful in negotiating to a higher point in the range. Still, the supposition that there has been a violation--no more than a supposition, the way we have approached the case--does not matter if the violation did not cause any injury. Causation is an essential ingredient of any securities case. In an action under Sec. 10(b), the plaintiff cannot take advantage of the rescissionary remedies provided elsewhere in the securities laws. Cf. Randall v. Loftsgaarden, --- U.S. ----, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). If, for example, a firm reveals that an earlier public statement was mistaken, but the price of the securities does not move in response, the investors suffer no damages. The plaintiff must prove damages, must establish the difference between the price received in fact and the price that would have been received but for the fraud. See Mills v. Electric Auto-Lite Co., 552 F.2d 1239 (7th Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977) (dismissing a securities case, despite an earlier holding by the Supreme Court that fraud had occurred, on the ground that the plaintiff could not establish that in the absence of the fraud he would have received a greater price).
 
 
 20
 Sometimes remedies under the securities laws are based on defendants' gain rather than plaintiffs' loss, or plaintiff may have an election, see Affiliated Ute Citizens v. United States, 406 U.S. 128, 154-55, 92 S.Ct. 1456, 1472-73, 31 L.Ed.2d 741 (1972). The choice between loss-based and gain-based remedies may present issues of great subtlety and substantial moment. But when only price is at issue, it is unnecessary to analyze all the nice points that may arise. The plaintiffs have not asked for rescission of the sale--probably because Mary's devisees do not want to be locked into a fractured minority position in a closely held corporation. "Lock in" can be much harsher to a minority shareholder than is a low price. Damages alone are at issue. If full disclosure would have led to a sale at $350, or $800, or $1,400, or any other price, the marital trust's loss matches the gain of the investors of Moline Consumers as a whole. James Ellis did not hold all of Moline's stock, so he gained less than Mary Ellis lost (if she lost anything); Moline Bank and Duff & Phelps gained nothing of substance. The most the Mary Ellis estate can recover, then, is the difference between $271 and the price for which Mary could have held out (or the court would have imposed) had all information been revealed. See Levine v. Seilon, Inc., 439 F.2d 328, 333-34 (2d Cir.1971) (Friendly, J.); Louis Loss, Fundamentals of Securities Regulation 1133-34 (1983) (collecting cases).
 
 
 21
 The finding that $271 was "advantageous" to the estate, however, means that the plaintiff cannot show that a higher price was available. Under the law of trusts, $271 was a favorable price or it could not properly have been approved. Harris Trust does not argue to us that, if the finding has preclusive effect, there is anything left to litigate. With damages out of the picture, and in the absence of a request for rescission, there is no point in deciding the merits. Mary's estate is not entitled to relief.
 
 
 22
 The same finding disposes of the RICO suit. That statute allows treble damages, but treble nothing is still nothing. Because relief is unavailable, we need not decide whether the complaint pleaded fraud with "particularity" under Rule 9(b) or established the necessary "pattern" of criminal offenses.
 
 AFFIRMED
 
 23
 RIPPLE, Circuit Judge, concurring.
 
 
 24
 The court holds today that the appellant is precluded from asserting claims under the Securities Exchange Act and RICO because a previous valid judgment in the Illinois courts found that the selling price of the stock was "advantageous" to the estate. This finding, which we must respect under the mandate of 28 U.S.C. Sec. 1738, precludes recovery under either statute and obviates the need to deal with the merits of either federal cause of action. On that understanding, I join the judgment and opinion of the court.
 
 
 
 [1]
 It is unlike the "routine[ ]" approval given in Norris, 719 F.2d at 258, which did not discuss the consequence, if there was any, of a rubber stamp wielded by a state court. The fraud alleged in Norris was obtaining the "uninformed approval" (ibid.) of the beneficiary, not pulling the wool over a judge's eyes
 
 
 [2]
 We disregard the proceedings in 1984 because they are a wash. The marital trust had been underfunded by $224,000. The transfer of 423 shares of stock to the trust at $271, and its resale at the same price, satisfied $114,633 of the shortfall. (Other assets made up the balance.) Had the trustee valued the stock at $1,400 per share, the marital trust would have received 81.88 shares and, on selling these, the same amount of cash. The valuation in 1984 therefore did not injure the marital trust no matter what the price should have been