Johnny RICHARDSON, Plaintiff,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION, Defendant.

Civ. A. No. 90–1592.

United States District Court,
District of Columbia.

July 14, 1993.

H. Vincent McKnight, Jr., Ashcraft & Gerel, Washington, DC, for plaintiff.

Donald M. Gilberg, Mark Westerfield, Martha Ann Knutson, Gilberg & Kurent, Washington, DC, for defendant.

Jacob A. Stein, Glenn Mitchell, Stein, Mitchell & Mezines, Washington, DC, for Dr. Jeffrey Goltz.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This case involves a personal injury suit filed by Plaintiff, Johnny Richardson, against Defendant National Railroad Passenger Corporation ("Amtrak") under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* Presently before the Court are Defendant's Motion to Set Aside Plaintiff's Purported Acceptance of Defendant's Offer of Judgment Due to Revocation of Offer and Fraud and Defendant's Motion for a New Trial. The procedural background of this case is as follows.

In the fall of 1987, Plaintiff, an employee of Amtrak, injured his right shoulder while working on the job. In February 1988, Plaintiff underwent surgery for injury to his shoulder. In July 1990, Plaintiff filed suit and in December 1991, a jury trial was held. On January 2, 1992, the jury returned a judgment in favor of Plaintiff and found damages in the amount of $500,000. The jury also found Plaintiff to be 12% contributorily negligent, thereby reducing his award to $440,000.

On February 25, 1992, the Court issued a remittitur reducing the amount of total damages to $175,000; applying the 12% contributory negligence found by the jury, the Court reduced the judgment to $154,000. The Court gave Plaintiff 30 days to accept the remittitur or to elect a new trial solely on the issue of damages.

Plaintiff rejected the remittitur and elected to proceed to trial on the issue of damages. Trial on damages was set for June 8, 1992. Defendant then requested leave to conduct an independent medical examination and for limited discovery on the question of damages, and at a May 22, 1992 status hearing, the Court granted Defendant's request.

On May 22, 1992, prior to the date of the new trial, Defendant filed an Offer of Judgment in the amount of $150,000 pursuant to Rule 68 of the Federal Rules of Civil Procedure. On June 4, 1992, by letter transmitted to Plaintiff's counsel by facsimile, Defendant withdrew its Offer of Judgment. On June 5, 1992, Plaintiff accepted Defendant's Offer. Plaintiff interprets Rule 68 to require an Offer of Judgment to remain open for the statutorily-prescribed 10–day period. Therefore, Plaintiff contends that his acceptance of Defendant's Offer is valid, despite Defendant's purported withdrawal.

Defendant does not quarrel with Plaintiff's contention, unless "extenuating circumstances" are present. If the Court finds that such extenuating circumstances—for example, fraud—exist, Defendant maintains that it should be permitted to withdraw the Offer. Based on this rationale, Defendant filed a Motion to Set Aside Plaintiff's Purported Acceptance of Defendant's Offer of Judgment. Evidentiary hearings on Defendant's motion began on August 12, 1992. On December 11, 1992, Defendant went further and filed a Motion for a New Trial pursuant to Federal Rule of Civil Procedure 60(b). These two motions are currently before the Court. Evidentiary hearings were held on August 12, 1992 and January 15, February 5, February 19, March 12, March 26, April 15, April 16, May 20 and May 26, 1993. Oral argument was heard on July 9, 1993.

The Court has allowed a full exploration of the issues raised in Defendant's motions. Amtrak has presented compelling testimony of fifteen of the finest physicians and surgeons in the Washington, D.C. area. The

Court commends these doctors for their willingness to come forward in this case. Their testimony raises the question whether Plaintiff's treating physician and expert at trial, Dr. Jeffrey Goltz performed the operation which he testified he had performed in February 1988. Equally troubling to this Court is the uncontested fact that at trial Dr. Goltz falsely identified the educational institutions he attended and misrepresented certain other of his credentials.

Defendant bears a heavy burden in this case. Amtrak agrees that it must prove its case by clear and convincing evidence. Dr. Goltz also has presented strong evidence that the operation could have been performed as claimed.[1]

■ Defendant has not provided any real evidence that the plaintiff was in any way implicated in Dr. Goltz' misstatements or alleged misconduct. Thus, for the reasons stated more fully below, the Court finds that Amtrak has not met its burden and that the equities in this case weigh heavily in favor of the Plaintiff who, as far as the Court can determine, is an innocent victim in these proceedings. Accordingly, Defendant's motion for a new trial will be denied. Defendant will not be permitted to withdraw its Offer of Judgment, and Plaintiff's acceptance of the Offer will stand.

■ Rule 68 provides that an offer of judgment must be accepted within 10 days from the date the offer is made. An offer not accepted within 10 days automatically expires. The rule, however, is silent on the question of whether or not an offer of judgment can be revoked prior to the expiration of the statutorily-prescribed ten-day period. At oral argument on July 9, 1993, Defendant conceded that, once made, a Rule 68 Offer of Judgment must remain open for ten days and cannot be withdrawn absent so-called "extenuating circumstances".

While Defendant's concession obviates the Court's need to rule on a defendant's absolute right to withdraw an Offer of Judgment at any time prior to Plaintiff's acceptance and before the expiration of the ten-day period, the Court believes that Defendant is correct that a Rule 68 Offer of Judgment must remain open for ten days absent extenuating circumstances.

Amtrak submits that such circumstances do exist. Amtrak alleges that Dr. Goltz inflated his credentials and testified falsely at trial regarding the operation he performed on Plaintiff and the extent of the injury Plaintiff sustained. In particular, Defendant alleges that Dr. Goltz falsely testified that the Plaintiff suffered from a 19% permanent partial disability and that Dr. Goltz had surgically repaired a large tear in the rotator cuff of Plaintiff's injured shoulder. Defendant claims that, while there is no question that Dr. Goltz performed *some* surgery, Plaintiff never had a rotator cuff tear and does not suffer from a permanent disability, at least not to the extent asserted by Dr. Goltz at trial.

### A. *The Operation*

At the December 1991 trial, Dr. Goltz testified to the following sequence of events. Dr. Goltz first saw the Plaintiff on October 7, 1987, eight days after Plaintiff sustained an injury to his right shoulder. At that time, Dr. Goltz made a diagnosis of bursitis, impingement of the right shoulder and decreased range of motion of the shoulder.[2] He gave Plaintiff some anti-inflammation treatment and started him on physical thera-

---

1. Because Dr. Goltz' interests are clearly at stake, the Court permitted Dr. Goltz to retain and be represented by separate counsel in these proceedings.

2. The pertinent part of the shoulder anatomy for purposes of the issue currently before the Court is as follows:

   The shoulder joint consists of a ball and a socket. Directly on top of this ball and socket is a musculotendinous area ... called [the rotator] cuff. Directly above the cuff is the roof. The roof consists of a bone and ligament

... The ligament is the coracoacromial ligament, and the bone is the acromion.

   The space between the ball and socket and this roof [called the bursa] is less than a thin dime ...

   An impingement occurs when something occupies the small space between the ball and socket and results in pain when the patient raises his or her arm ...

   Bursitis is inflammation of the joint.

   Testimony of Dr. Goltz, Tr. 3/12/93 at 5, 6, 11.

py. Initially, Plaintiff's condition improved, but beginning in mid-November Plaintiff started to lose some range of motion. On December 10, 1987, at Dr. Goltz' direction, an arthrogram of Plaintiff's injured shoulder was taken in order to aid in further diagnosis of Plaintiff's injury. The primary purpose of the arthrogram was to see whether or not Plaintiff suffered from a tear in the rotator cuff. An arthrogram involves the injection of a dye into the patient's joint and the subsequent taking of an x-ray. If the dye leaks out, as shown on the x-ray, this suggests a tear in the rotator cuff and the arthrogram is said to be positive. If no dye leaks out, this suggests no tear and the arthrogram is said to be negative. The arthrogram taken of Plaintiff's shoulder was negative.

Dr. Goltz continued his diagnosis of impingement syndrome, although he testified that he did not rule out a possible tear despite the negative arthrogram, since false negatives are a possibility. Because Plaintiff's condition was not improving, Dr. Goltz decided to admit Plaintiff for surgery for "impingement syndrome". This course of treatment, including the need to operate, was approved by Defendant. Mr. Richardson underwent surgery on February 11, 1988.

At trial, Dr. Goltz described the operation as follows. In order to relieve Plaintiff's "impingement syndrome", Dr. Goltz made a small skin incision. He then cut and resected the coracoacromial ligament. Dr. Goltz then inspected Plaintiff's rotator cuff. It was at that point that Dr. Goltz testified he discovered a "large" rotator cuff tear, which he repaired using seven sutures.[3]

Defendant presented the testimony of sixteen expert witnesses, including nine orthopaedic surgeons and five experts in radiology and/or magnetic imaging resonance, a pathologist and a physical therapist.[4] The most salient and compelling points made by these experts are the following:

1. Dr. Goltz testified at trial that he repaired a large rotator cuff tear. Defendant's experts uniformly testified that it would be virtually impossible for a surgeon to repair a clinically significant tear of the rotator cuff through an incision the size, and at the location, of the incision made by Dr. Goltz in Plaintiff's shoulder.[5]

2. Mr. Richardson's operative records reflect an operating time of 37 minutes. Defendant's experts testified that an average time for performing a rotator cuff repair is 1 and ½ hours and that this procedure cannot be done in 37 minutes.

3. Dr. Goltz performed Plaintiff's operation on an outpatient basis. Defendant's experts testified that patients undergoing rotator cuff repairs should be kept overnight.

4. The arthrogram taken of the plaintiff prior to surgery was negative, indicating no tear to the rotator cuff. While Defendant's experts agree that arthrograms do show false negatives, they all thought it highly unlikely that a false negative was a issue in this case.

Dr. Goltz testified at trial that the reason that the arthrogram was negative is that the plaintiff's bursa was so inflamed that it pre-

---

3. There is some question as to whether it was Dr. Goltz or the Chief Resident who performed the surgery. It is impossible to determine with any degree of certainty who actually operated on the plaintiff on February 11, 1988, since none of the witnesses who testified could actually remember the operation in question. There is no question, however, that Dr. Goltz either performed the operation or it was done under his direct supervision. Moreover, it was Dr. Goltz who testified at trial concerning the operation and extent of Plaintiff's injury, and it is clear that Dr. Goltz accepts full responsibility for the surgery performed.

4. The orthopaedic physicians who testified for Amtrak are Doctors Robert J. Neviaser, John B. Cohen, Charles H. Epps, Marvin Givson, Stephen

Haas, Stanford Lavine, Louis E. Levitt, Randall J. Lewis and Joseph Linehan. Defendant's radiology and magnetic resonance imaging experts are Doctors Dana Twible, Alexander Mark, Barbara Dinsmore, James Jelinek and Vincent Mascatello. Doctor Robert Scott Klappenbach is a pathologist and Jeffrey W. Wright is a physical therapist, each of whom also testified for Amtrak.

5. Defendant's experts agree that some operation on Plaintiff's shoulder was performed and that the surgical incision made by Dr. Goltz is appropriate for an operation to cut and resect the coracoacromial ligament, a procedure which Dr. Goltz says that he did. However, this is a different operation, involving a less serious injury and not a tear in the rotator cuff.

vented the dye injected into the plaintiff from leaking out. However, Defendant's experts point out, the pathology report revealed no inflammation of Plaintiff's bursa.[6]

An alternative theory advanced by Dr. Goltz during the hearings on the issue currently before the court is that Mr. Richardson suffered from a partial thickness tear, not a full thickness one. A partial thickness tear is one in which the tear does not go all the way through the muscle or tendon. The experts agree that false negatives can occur where a patient suffers from a partial thickness tear. The reason for such false negatives is that the dye injected in the patient's joint may not leak out where the tear is not "through and through".

Dr. Goltz' more recent suggestion that the Plaintiff's tear may have been a partial thickness one, while not impossible, is problematic. Plaintiff's medical records do not state whether the tear was full or partial. However, according to Defendant's experts, the existence of a partial thickness tear would not be consistent with Dr. Goltz' trial testimony and operative notes.

Dr. Lavine, for example, testified as follows:

A. Well, the records I reviewed ... in which he states that there was a large longitudinal tear and entered the joint would make me feel that it was not a partial superficial layer tear.

Q. When one enters the joint by nature does that mean a full thickness tear?

A. Yes.

Testimony of Dr. Stanford Lavine, Hearing transcript, April 15, 1993, at 14.

Moreover, Dr. Goltz' explanation at trial for the negative arthrogram—that an inflamed bursa prevented leakage—makes sense only in the context of a full thickness tear, since in the case of a partial thickness tear it would be the muscle or tendon of the cuff itself, not an inflamed bursa, which would prevent leakage. Clearly, Dr. Goltz himself had contemplated a "through and through tear".

5. Dr. Goltz testified, both at trial and during the post-trial hearings, that he operated for impingement syndrome and that during the operation he discovered a tear in the supraspinaeous tendon of Plaintiff's rotator cuff, which he then repaired. Dr. Goltz testified that the tear was secondary to—that is, caused by—Plaintiff's impingement syndrome. If this diagnosis were accurate, Defendant points out, one would have expected to find inflammation of Plaintiff's bursa. However, as noted, the pathology report revealed no such inflammation.

6. Several years after Plaintiff's surgery, a magnetic resonance imaging ("MRI") was taken of Plaintiff's injured shoulder.[7] While not ordinarily used to determine whether or not an operation has been performed, both Defendant's and Dr. Goltz' MRI experts agreed that one would expect evidence of prior surgery to be evident on an MRI. Defendant's experts testified that the MRI revealed no evidence that a repair to the rotator cuff had been performed.[8]

7. Defendant's experts testified that degenerative tears—which occur because something is impinging on the cuff, as alleged by Dr. Goltz—are almost unheard of in young,

---

6. Dr. Goltz argues that he only had *assumed* that an inflamed bursa caused the negative arthrogram and that this was merely a *possible* explanation offered at trial. Upon review of the trial transcript, however, the Court finds that a reasonable jury could well have concluded that Dr. Goltz was offering a definitive explanation.

7. "[M]agnetic resonance imaging simply is the combined use of ... magnetic and radio waves ... [which provides] a dramatic way of being able to look into the human body without having to do any type of incision ... It allows us to separate all the different anatomic structures of the human body, including the tissues above the subcutaneous tissues, the muscles, the tendons

and ligaments, [and] cartilage ..." Testimony of Dr. Michael Zlatkin, Tr. 2/19/93 at 7–8.

8. It is not these experts' assertion that the MRI reveals no evidence of any surgery whatsoever. Dr. Vincent James Mascatello, for example, testified on January 15, 1993 that he saw some evidence of some sutures and surgically-related artifact, but that such evidence was in anatomically distinct areas from the location of the tear Dr. Goltz testified he repaired.

Dr. Zlatkin testified for Dr. Goltz that he found evidence in the MRI consistent with the surgery Dr. Goltz claims to have performed. Dr. Zlatkin's testimony is discussed below.

healthy males like the plaintiff, who was 33 years old at the time of his injury. Full thickness tears, which are the type generally found in such individuals, usually are secondary to a violent trauma which tears the muscle or tendon, thus casting further doubt on Dr. Goltz's theory that the plaintiff suffered from a cuff tear related to impingement syndrome.

8. While Defendant's experts do not question that *some* form of surgery was performed,[9] they do question the medical appropriateness of Dr. Goltz's decision to operate in the first place. Plaintiff's medical records suggest that Mr. Richardson may have lost some range of motion in his shoulder in the months prior to November 1987. However, during the next few months, leading up to the February 11, 1988 surgery, Mr. Richardson's medical records reveal steady improvement in his range of motion. Defendant's experts testified that conservative treatment for a patient diagnosed with impingement syndrome is most appropriate. They say that a patient with impingement syndrome who is demonstrating steady, if slow, improvement, should not be admitted for surgery.

9. Dr. Goltz billed for performing an arthrotomy of the acromioclavicular joint ("AC joint"),[10] but there is no mention of this procedure in the operative report of Plaintiff's surgery and, Defendant's experts testified, there is no evidence that such an arthrotomy was performed. Dr. Goltz also billed for both a rotator cuff repair and a coracoacromial ligament release. Defendant's experts testified that, where a rotator cuff repair is performed, the ligament release is considered to be part of that procedure and should not be separately billed.

Dr. Goltz paints a different picture.[11] He suggests that he erroneously reported repairing a "large" tear at trial and that the tear must have been a small one. Dr. Goltz's

experts testified that a rotator cuff tear could be repaired through the incision made by Dr. Goltz in the plaintiff's shoulder; that, if there were no complications, the operation could be performed in 30–35 minutes; and that such an operation can be performed on an outpatient basis.

Dr. Goltz's MRI expert, Dr. Zlatkin, testified that while at first he saw no evidence on the MRI that a cuff tear had been repaired, on a careful second look he identified a signal which is compatible with the surgery Dr. Goltz claims to have performed. Dr. Goltz and his experts testified that false negatives on arthrograms are not uncommon and that such could have been the case on Richardson's arthrogram if, for example, his tear was not through and through. Dr. Goltz argues that at trial he had testified only that he had *assumed* that an inflamed bursa caused the arthrogram's false negative, not that he had definitively asserted that reason as fact.

Finally and most persuasive, Dr. Goltz presented the testimony and medical records of Paula Nickey. No witness for either side in this case had any present recollection of the operation that Mr. Richardson underwent in February 1988. Thus, there was no eyewitness testimony as to what transpired during the operation. Each of the experts could only attempt to reconstruct what happened based on Plaintiff's pre- and post-surgery medical records. As noted above, Defendant's expert surgeons testified that a tear in the rotator cuff cannot be repaired through the incision made by Dr. Goltz; at best, some testified, one or two—but not seven—sutures could be placed in the cuff using the incision made on Mr. Richardson.

The Ms. Nickey case provides convincing evidence to the contrary. In April 1992, Ms. Nickey suffered from a rotator cuff tear, which was repaired by Dr. Goltz through an incision made in the same location and of approximately the same length as Richard-

---

9. *See* notes 5 and 7, *supra.*

10. The AC joint is where the collar bone joins the shoulder. Arthrotomy means to open up the joint.

11. Three orthopaedic surgeons, in addition to Dr. Goltz, testified on his behalf: Dr. Richard

Wells, Dr. Thomas F. Ryan, and Dr. Robert A. Smith testified for Dr. Goltz. Dr. Smith is Dr. Goltz's partner and was the assisting physician during the operation at issue in this case. Dr. Michael Zlatkin, an expert on MRIs, also testified for Dr. Goltz.

son's incision. The Nickey case certainly puts into question the testimony of Defendant's experts that a rotator cuff repair cannot be performed through the incision testified to by Dr. Goltz. The Nickey case demonstrates that Dr. Goltz could indeed have repaired a rotator cuff tear at the exact location of Richardson's incision. What is more, Ms. Nickey's surgery was performed on an outpatient basis. Defendant was not able to counter this with any persuasive evidence.[12]

## B. Dr. Goltz's Inflation of His Credentials

Particularly troubling to this Court is the unchallenged evidence that Dr. Goltz greatly inflated his credentials at trial. Some of the more serious misrepresentations made by Dr. Goltz at the December 1991 trial include the following:

1. Dr. Goltz testified that he attended the University of Michigan as an undergraduate and New York University Medical School when, in fact, he attended Michigan State University and New York Medical College.

2. Dr. Goltz testified that following his residency, he served as the chief of orthopaedics at Scott Air Force Base and Clark Air Force Base during the Vietnam War. In fact he did not serve as chief of orthopaedics at Scott Air Force Base and was at no time on active duty at Clark Air Force Base.

3. Dr. Goltz testified that he was licensed to practice in Pennsylvania even though he is not so licensed.

4. Dr. Goltz testified that he was a member of the Royal College of Medicine and the American Orthopedic Academy and a fellow at the Royal College of Surgeons. In fact, he has conceded that he is not a member of, or fellow at, these organizations.

5. Dr. Goltz testified that he currently held active privileges to admit patients at a number of D.C. area hospitals. In fact, most of the hospital privileges he mentioned had lapsed.

## C. Conclusions of Law

Defendant's motions to set aside Plaintiff's acceptance of the offer of judgment and for a new trial on damages bring Rule 60(b)(3) and 60(b)(6) of the Federal Rules of Civil Procedure into play. Rule 60(b) provides, in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party ... or (6) any other reason justifying relief from the operation of the judgment.

■ Under Rule 60(b)(3), the movant must show (1) that such "fraud" prevented him or her from fully and fairly presenting his or her case, see, e.g., Harre v. A.H. Robins Co., 750 F.2d at 1503; Square Const. Co. v. Washington, Etc., 657 F.2d 68, 71 (4th Cir.1981) and (2) that the fraud is attributable to the party or, at least, to counsel.[13]

■ A court can provide relief from judgment under Rule 60(b)(6) for fraud perpetrated by a third party, including an adversary's witness. See Armour and Company v. Nard, 56 F.R.D. 610 (N.D.Iowa 1972); Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826 (7th Cir.1985). While Rule 60(b)(6) possibly could obviate the need to prove culpability on Plaintiff's part, Rule 60(b)(6) is to be invoked only in exceptional circumstances, when "the violation [has] created a substan-

---

12. Defendant did argue that new technology enabled Dr. Goltz to perform the Nickey surgery, which occurred four years after Richardson's operation. It is important to remember, however, that the testimony of Defendant's experts did not make room for such technological advances. It was their testimony that even today the operation reflected in Mr. Richardson's medical records could not be performed through the incision made in his shoulder.

13. In Harre v. A.H. Robins Co., 750 F.2d 1501 (11th Cir.1985), the Eleventh Circuit granted the plaintiff's motion under Rule 60(b)(3) based on the fraudulent testimony the defendant's expert witness. The Court found that the expert witness in question so testified "with complicity of counsel." Id. at 1505. While such complicity may well bring a party within the scope of Rule 60(b)(3), as discussed below, such complicity does not exist in the case presently before this Court.

tial danger of an unjust result." *Metlyn Realty Corp.*, 763 F.2d at 832 (citations omitted). As discussed below, the Court does not find that setting aside the Offer of Judgment is warranted in this case.

■ The underlying purpose of both Rule 60(b)(3) and Rule 60(b)(6) is to ensure that justice and fundamental fairness are not defeated. It is for the court to weigh conflicting equities, including the interests of plaintiffs and defendants and the interest of finality of judgments and fundamental fairness.[14] Whether to set aside a judgment under either 60(b)(3) or 60(b)(6) is a question left to the sound discretion of the Court. *See Metlyn Realty Corp.*, 763 F.2d at 831.

Defendant has presented the testimony of numerous doctors, who took the unusual and bold step of publicly testifying against another doctor in their community, and whose testimony the court found highly credible. Their testimony raises serious questions for the Court to decide.

On the record before it, the Court does not find that Amtrak has met its burden of proving "fraud" by "clear and convincing" evidence. As noted, the Paula Nickey case casts substantial doubt on Defendant's primary contention that the operation Dr. Goltz claims to have performed in this case could not have been done. Nobody remembers what actually took place during Mr. Richardson's operation. While Amtrak has presented much credible testimony to support its contention that the operation as described by Dr. Goltz did not take place, it has not proved its case by clear and convincing evidence. The Nickey case provides enough

doubt to preclude this Court from finding that the Richardson operation as described by Dr. Goltz could not have taken place.[15]

■ Critical to setting aside a final judgment under Rule 60(b)(3) is that the alleged fraud be attributable to the opposing party. There is no convincing evidence showing that Mr. Richardson was in any way involved in Dr. Goltz' misstatements or alleged misconduct. Amtrak presented the testimony of two witnesses on this issue. Dr. Linehan testified that when he examined the Plaintiff, Mr. Richardson exhibited less range of motion than that reflected in his medical records. A physical therapist testified that the results of some "biodex" diagnostic tests he performed on Mr. Richardson were erratic and that this suggested Mr. Richardson was intentionally trying to exaggerate the extent of his injury.

The Court does not find this testimony sufficient to establish with any degree of reliability that Mr. Richardson was intentionally trying to mislead his examiners or was involved in a concerted effort with Dr. Goltz to misstate the extent of his injuries. Both Dr. Linehan's examination of Mr. Richardson and the "biodex" testing took place after the trial. The evidence at trial was clear that the Plaintiff was anxious to return to work and had made every attempt to do so. Thus, the evidence of Mr. Richardson's behavior after trial, even if it were credible, is not probative of the question of whether or not Mr. Richardson colluded with Dr. Goltz to mislead the jury and the Court *during* the trial.

---

14. *See*, e.g., *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C.Cir.1980) ("Rule 60(b) was intended to preserve the delicate balance between the sanctity of final judgments and the incessant command of the court's conscience that just be done in light of all the facts") (citations omitted); *Metlyn Realty Corp.*, 763 F.2d at 831 ("The district judge must weigh incommensurables—the value of finality, the probability that an error affected the outcome of the proceeding, the probability that a second go-round would produce a 'better' outcome, the costs of that second proceeding to the parties (and ultimately to society as the finality of judgments is undercut).")

15. The testimony of Defendant's experts, all of whom are highly respected in the local medical

community, casts substantial doubt on the conventionality of the treatment Dr. Goltz provided Plaintiff and the operation he performed. What must be remembered, however, is that this is not a malpractice case and the issue of conventionality or appropriateness of treatment is not before this Court. What is before the Court is whether or not Dr. Goltz could have reached Plaintiff's rotator cuff and repaired a tear in the cuff through the incision made in Plaintiff's shoulder. The Nickey case, which stands on the record uncontradicted, makes it clear that it is possible to perform the operation described in Plaintiff's operative report through the incision made in Plaintiff's shoulder.

There has been no suggestion that Plaintiff, who was under a general anaesthesia during the February 1988 surgery, or his counsel knew or should have known that Plaintiff did not have a tear in his rotator cuff. Nor is there any evidence in the record to suggest that Mr. Richardson or his counsel knew or should have known that Dr. Goltz misstated his credentials. Because the Court finds that the Plaintiff was in no way complicit in Dr. Goltz conduct, Defendant cannot obtain relief under Rule 60(b)(3).

The Court does not find that Defendant was prevented from fully presenting its case in any respect. Defendant had competent medical experts and, while voluminous evidence was introduced during the post-trial motions, the fact is that all of this evidence could have been discovered before the 1991 trial. The only really "new" development which seems to account for the discovery and raising of the issue of fraud after the close of trial is Defendant's retention of new counsel. As effectively as new counsel performed, it cannot be a sufficient basis on which to award a new trial. And while the Court does not minimize Dr. Goltz' inflation of his credentials—indeed, the Court is very troubled by this fact—it appears that counsel for Amtrak was aware of Dr. Goltz' "credential problem" prior to its making an Offer of Judgment, if not earlier. *See* Transcript of June 8, 1992 hearing at 5, 6.

The equities in this case weigh in favor of the Plaintiff. As noted, the Court does not find Amtrak has met its burden by clear and convincing evidence. What is particularly important to the Court's decision is the fact that Plaintiff was in no way implicated in the alleged misconduct. Plaintiff would be terribly prejudiced if he had to retry this case. Because of Dr. Goltz' "credential problem", Plaintiff could not be expected to rely on Dr. Goltz solely as his medical expert, and it would be difficult for Plaintiff to find a substitute orthopaedic physician at this point to testify on his behalf.

While Amtrak has proved that Dr. Goltz has misstated his credentials, there is no suggestion that Plaintiff knew about such misstatements and he should not be held responsible for them.

The credential issue is the only basis on which the Court could decide that the Offer of Judgment should be set aside and a new trial on damages conducted. While the Court is deeply troubled by Dr. Goltz' misstatements, on the state of the present record, this alone is not sufficient to set aside the Offer of Judgment.

It is undisputed that the Plaintiff did sustain a serious injury, for which the jury found Defendant to be liable. The Court believes that fairness to both Defendant and Plaintiff is best served by permitting Plaintiff's acceptance of Defendant's offer of judgment to stand.

■ The jury originally returned a verdict of $500,000 (reduced to $440,000 due to Plaintiff's 12% contributory negligence). Without the benefit of post-trial proceedings, the Court, under its supervisory authority, remitted the award to $175,000 (reduced to $154,000 due to Plaintiff's contributory negligence). The remittitur was based on the Court's finding that the jury had been unreasonable in assessing Plaintiff's damages and that a considerably more modest award was justified.

While Plaintiff rejected the Court's remittitur, he accepted Defendant's subsequent Offer of Judgment in the amount of $150,000. As noted, at the time Amtrak made the Offer of Judgment, it was aware of Dr. Goltz' "credential problem". Thus, to grant a new trial under these circumstances would work an injustice on Plaintiff and would unnecessarily extend this case.

Having heard extensive testimony on the nature of the operation and injury Plaintiff sustained, this Court finds that $150,000 is a fair recovery in the circumstances of this unusual case.

The Court wants again to emphasize the quality, impressiveness and credibility of Defendant's experts. But what remains unexplained is the fact that Amtrak chose to present no medical testimony during the 1991 trial. The medical record about which Defendant's experts testified during the post-trial hearings existed at the time of the trial. All the evidence upon which Defendant relied

during the post-trial hearings was available or readily discoverable before trial. Yet Defendant chose not to present expert testimony challenging the record at that time. To permit a new trial under these circumstances, particularly where the prevailing party has engaged in no wrongdoing, would allow the losing party to second-guess the results of the original trial and would create a dispute-resolution process without finality. Amtrak had ample opportunity to present its case fully at the original trial. Mr. Richardson should not suffer because Amtrak chose not to do so. It is with a degree of reluctance, but in furtherance of the important policy of bringing lawsuits to a close, that the Court will deny Defendant's motions.

An appropriate Order accompanies this Opinion.

### ORDER

Before the Court are Defendant's Motion to Set Aside Plaintiff's Acceptance of Defendant's Offer of Judgment and Defendant's Motion for a New Trial. After conducting an evidentiary hearing on Defendant's motions, for the reasons stated in the foregoing Memorandum Opinion, it is hereby

ORDERED that Defendant's Motion to Set Aside Plaintiff's Acceptance of Defendant's Offer of Judgment is DENIED; it is

FURTHER ORDERED Defendant's Motion for a New Trial is DENIED; it is

FURTHER ORDERED that Plaintiff's acceptance of Defendant's Offer of Judgment in the amount of $150,000 will be allowed to stand; and it is

FURTHER ORDERED that final judgment in the amount of $150,000 is entered in favor of Plaintiff.